UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **DIANE PETKUS**, | Case No. 3:12-cv-00075-SI |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| **CAROLYN W. COLVIN**,[1] | |
| Acting Commissioner of Social Security, | |
| Defendant. | |

Tim Wilborn, P.O. Box 370578, Las Vegas, NV 370578. Attorney for Plaintiff.

S. Amanda Marshall, United States Attorney, and Adrian L. Brown, Assistant United States Attorney, United States Attorney's Office, District of Oregon, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204-2902; David Morado, Regional Chief Counsel, Region X, and Gerald J. Hill, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, 701 Fifth Avenue, Suite 2900 M/S 221A, Seattle, WA 98104-7075. Attorneys for Defendant.

---

[1] Subsequent to the filing of the Complaint in this case, the term of Michael J. Astrue, the named defendant Commissioner of Social Security, expired and, thus, the name of the current acting Commissioner has been substituted in the caption.

**SIMON, District Judge**.

Diane Petkus seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). Because the Commissioner's decision was not supported by substantial evidence, the decision is reversed, and this case is remanded for the payment of benefits.

## BACKGROUND

### A. The Application

Ms. Petkus protectively filed an application for Disability Insurance Benefits ("DIB") on June 7, 2005, alleging disability beginning on July 15, 1997. Tr. 25. She alleges disability due to hearing loss, depression, anxiety, and a chronic skin rash. Tr. 134. The Commissioner denied her application initially and upon reconsideration; thereafter, she requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 79-93. After an administrative hearing, held on April 23, 2007, ALJ Jones found Ms. Petkus to be not disabled. Tr. 45-53, 474-502. The Appeals Council granted Ms. Petkus' subsequent request for review, vacated the hearing decision, and remanded. Tr. 39-41. After a second administrative hearing, held on September 23, 2008, ALJ Atkins found Ms. Petkus to be not disabled. Tr. 427-36, 503-34. The Appeals Council again granted Ms. Petkus' request for review, vacated the hearing decision, and remanded. Tr. 438-40. After a third administrative hearing, held February 7, 2011, ALJ Say found Ms. Petkus to be not disabled. Tr. 25-35, 535-62. The Appeals Council denied Ms. Petkus' request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 7–10. Ms. Petkus now seeks judicial review of that decision.

**B.  The Sequential Analysis**

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.,* 648 F.3d 721, 724 (9th Cir. 2011); *see also* 20 C.F.R. § 404.1520 (DIB); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  Each step is potentially dispositive. 20 C.F.R. § 404.1520(a)(4). The five-step sequential process asks the following series of questions:

1.  Is the claimant performing "substantial gainful activity?"  20 C.F.R. § 404.1520(a)(4)(i). This activity is work involving significant mental or physical duties done or intended to be done for pay or profit.  20 C.F.R. § 404.1510. If the claimant is performing such work, she is not disabled within the meaning of the Act. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not performing substantial gainful activity, the analysis proceeds to step two.

2.  Is the claimant's impairment "severe" under the Commissioner's regulations? 20 C.F.R. § 404.1520(a)(4)(ii). Unless expected to result in death, an impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a). This impairment must have lasted or must be expected to last for a continuous period of at least 12 months. 20 C.F.R. § 404.1509. If the claimant does not have a severe impairment, the analysis ends. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has a severe impairment, the analysis proceeds to step three.

3.  Does the claimant's severe impairment "meet or equal" one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii). If the impairment does not meet or equal one or more of the listed impairments, the analysis proceeds beyond step three. At that point, the ALJ must evaluate medical and other relevant evidence to assess and determine the claimant's "residual functional capacity" ("RFC"). This is an assessment of work-related activities that the claimant may still perform on a regular and continuing basis, despite any limitations imposed by his or her

impairments. 20 C.F.R. § 404.1520(e). After the ALJ determines the claimant's RFC, the analysis proceeds to step four.

4.    Can the claimant perform his or her "past relevant work" with this RFC assessment? If so, then the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot perform his or her past relevant work, the analysis proceeds to step five.

5.    Considering the claimant's RFC and age, education, and work experience, is the claimant able to make an adjustment to other work that exists in significant numbers in the national economy? If so, then the claimant is not disabled. § 404.1520(a)(4)(v); 404.1560(c). If the claimant cannot perform such work, he or she is disabled. *Id.*

*See also Bustamante v. Massanari,* 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof at steps one through four.  *Id.* at 953; *see also Tackett v. Apfel,* 180 F.3d 1094, 1100 (9th Cir. 1999); *Yuckert,* 482 U.S. at 140-41. The Commissioner bears the burden of proof at step five. *Tackett,* 180 F.3d at 1100. At step five, the Commissioner must show that the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id.*; *see also* 20 C.F.R. § 404.1566 (describing "work which exists in the national economy"). If the Commissioner fails to meet this burden, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante,* 262 F.3d at 953-54; *Tackett*, 180 F.3d at 1099.

**C.  The ALJ's Decision**

The ALJ performed the sequential analysis in his February 18, 2011 decision. Tr. 25-35. At step one, the ALJ found that Ms. Petkus did not engage in substantial gainful activity from her alleged onset date, July 15, 1997, through her date last insured, June 30, 2004. Tr. 27. At step two, the ALJ concluded that Ms. Petkus' hearing impairment, neurodermatitis, dysthymic

disorder, and anxiety disorder were severe impairments. Tr. 28. At step three, the ALJ ruled that

Ms. Petkus did not have an impairment or combination of impairments that met or medically

equaled one of the listed impairments in the regulations. Tr. 29.

The ALJ next assessed Ms. Petkus' residual functional capacity ("RFC"). The ALJ found

that Ms. Petkus retained the capacity to perform a full range of work at all exertional levels with

some nonexertional limitations, precluding noisy environments, more than occasional contact

with coworkers, more than limited contact with the public, telephone use, and time-pressured

environments. Tr. 30. At step four, the ALJ determined that Ms. Petkus' RFC rendered her

unable to perform her past relevant work. Tr. 33. At step five, based on the testimony of a

vocational expert ("VE"), the ALJ concluded that Ms. Petkus could perform jobs that exist in

significant numbers in the national economy. Tr. 34-35. Thus, the ALJ found Ms. Petkus not

disabled. Tr. 35.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on the proper

legal standards and the findings are supported by substantial evidence. 42 U.S.C. § 405(g); *see

also Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). "Substantial evidence" means

"more than a mere scintilla, but less than a preponderance." *Bray v. Comm'r Soc. Sec. Admin.,*

554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th

Cir. 1995)). It means "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Id.*

Where the evidence is susceptible to more than one rational interpretation, the

Commissioner's conclusion must be upheld. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th

Cir. 1982). Variable interpretations of the evidence are insignificant if the Commissioner's

interpretation is a rational reading of the record, and this court may not substitute its judgment for that of the Commissioner. *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005). "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (quotation marks omitted)). The reviewing court, however, may not affirm the Commissioner on a ground upon which the Commissioner did not rely. *Orn,* 495 F.3d at 630; *see also Bray,* 554 F.3d at 1226-26 (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947)).

## DISCUSSION

Ms. Petkus argues that the ALJ erred by: (1) failing to find her impairments meet or equal Listings 12.04 or 12.06; (2) improperly rejecting her subjective symptom testimony; (3) improperly rejecting the opinions of Drs. Feder, Bradley, and Tollerton; (4) improperly rejecting the lay witness testimony offered by Dr. Goza; and (5) relying on VE testimony at step five that is not supported by substantial evidence.

## A. Credibility

Ms. Petkus argues that the ALJ's adverse credibility finding was error. The Ninth Circuit has developed a two-step process for evaluating the credibility of a claimant's own testimony about the severity and limiting effect of the claimant's symptoms. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*)). When doing so, the claimant "need not show that her impairment could reasonably be expected to cause

the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, "if the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281). It is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell*, 947 F.2d at 345-46).

The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F.3d at 1284. The Commissioner recommends assessing the claimant's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms. *See* SSR 96-7p, *available at* 1996 WL 374186.

Further, the Ninth Circuit has said that an ALJ also "may consider . . . ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent

statements concerning the symptoms, . . . other testimony by the claimant that appears less than candid [and] unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen*, 80 F.3d at 1284. The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins*, 466 F.3d at 883.

The ALJ, applying the first step of the credibility framework, found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 31. In applying the second step, however, the ALJ found that "the claimant's statements concerning intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." *Id.* In support of the ALJ's finding, he offered several specific reasons: (1) Ms. Petkus' conservative course of medical treatment; (2) her non-compliance with medical treatment; (3) her inconsistent activities of daily living, including work after her alleged onset date; and (4) the opinion of an examining psychologist. Tr. 31-32.

## 1. Conservative Medical Treatment

The ALJ found that despite Ms. Petkus' assertion of "numerous subjective complaints, the record reveals she has received only conservative and routine treatment." Tr. 31. An ALJ may consider a claimant's conservative course of treatment in discounting a claimant's subjective symptom testimony. *See Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007); *Phillips v. Astrue*, CV-10-06367-AC, 2012 WL 1232005, at *4 (D. Or. Feb. 2, 2012), *adopted by* 2012 WL 1232419 (D. Or. Apr. 11, 2012) (conservative treatment was "a wrist splint for work and rest and Tylenol"). *Cf. Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (rejecting subjective pain complaints where petitioner's "claim that she experienced pain approaching the

highest level imaginable was inconsistent with the 'minimal, conservative treatment' that she received") (quotation omitted).

The ALJ notes that Ms. Petkus "has not been hospitalized for any significant period of time." Tr. 32. Although there is no evidence that Ms. Petkus was hospitalized, there is a substantial range of treatment options between nothing and hospitalization. *Cf. Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) ("Disability does not mean that a claimant must vegetate in a dark room."). Further, there is no evidence in the record that Ms. Petkus' physicians ever recommended she be hospitalized. Her treatment providers did suggest both group and individual counseling and a variety of psychotropic drugs. *See, e.g.*, Tr. 267, 329, 345. Moreover, nothing in the record suggests that a medical provider suggested a less conservative course of treatment that Ms. Petkus subsequently rejected. *See Parra*, 481 F.3d at 750-51 (affirming an ALJ's adverse credibility finding, in part, because the claimant was only treated with over-the-counter pain medication). As such, the ALJ's reliance on conservative treatment is neither a clear and convincing reason nor supported by substantial evidence.

### 2. Non-compliance with Recommended Medical Treatment

The ALJ also found that Ms. Petkus "did not put forth a good faith effort to achieve medical improvement" by failing to comply with recommended medical treatment. Tr. 32. An ALJ may consider a claimant's failure to follow a prescribed course of treatment when weighing a claimant's credibility. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1039-40 (9th Cir. 2008); *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995). In doing so, however, an ALJ must consider a claimant's explanation for failing to undergo the recommended treatment. *See Smolen*, 80 F.3d at 1284.

Regarding Ms. Petkus' mental impairments, the ALJ found that she "dropped out" of psychological treatment for her conditions and failed to comply with recommendations from Dr. Susan Feder, a treating psychiatrist. Tr. 31-32. In an opinion letter, Dr. Feder confirmed that Ms. Petkus ceased receiving mental health treatment from her in July 1997. Tr. 345-46. The ALJ's finding, however, results from an incomplete reading of the record. Dr. Feder reports that Ms. Petkus discontinued treatment because she lost her medical coverage after leaving her job. Tr. 345. Indeed, before Ms. Petkus' resignation, she had been receiving treatment from Dr. Feder for more than a year. *Id.* (treatment from March 1996 through July 1997). Because Ms. Petkus had a legitimate reason for discontinuing recommended mental health treatment, the ALJ's reason does not negatively reflect on her credibility. *See Orn*, 495 F.3d at 638.

The ALJ also notes that Ms. Petkus failed to comply with Dr. Feder's recommendations for treatment. Tr. 32. On March 11, 1998, Dr. Feder noted that Ms. Petkus "would benefit from medication, individual counseling, and job/vocational help on an ongoing basis." Tr. 347. Dr. Feder's recommendations, however, were tied to Dr. Feder's conclusion that Ms. Petkus was "progressing [from chronic recurring depression] to full long term depressive disorder." Tr. 347. Moreover, Dr. Feder noted that, based on her experience with Ms. Petkus, treating her depression would be "very difficult" and that "the prognosis is guarded." Tr. 345.

Further, there is no evidence Ms. Petkus failed to pursue the recommended treatment when she had the means of doing so. On April 16, 2002, Ms. Petkus underwent a psychological examination, performed by Dr. Beickel, as part of a vocational rehabilitation program. *See* Tr. 265-71. Dr. Beickel noted that Ms. Petkus was not currently taking any anti-depressant medication because she suffered adverse side-effects. Tr. 267. Dr. Beickel also noted that Ms. Petkus underwent an earlier vocational evaluation on January 19, 1999. Tr. 265.

Aside from a few short jobs, nothing in the record indicates that Ms. Petkus' financial situation improved after her alleged onset date. *See, e.g.*, Tr. 95. As such, evidence from after Ms. Petkus' date last insured corroborates earlier evidence of her lack of financial ability to obtain treatment. *See, e.g.*, Tr. 310 (granting Ms. Petkus a discount for medical services because of her income); Tr. 327 (noting efforts to obtain Ms. Petkus affordable prescriptions and affordable treatment for asymptomatic cervical cancer). Thus, the ALJ improperly relied on Ms. Petkus' treatment gaps to find her not credible.

### 3.  Activities of Daily Living

The ALJ also found that Ms. Petkus' "quite involved" daily activities were inconsistent with her subjective symptom testimony. Tr. 32. An ALJ may draw a negative inference when the claimant's daily activities either contradict the claimant's other testimony or meet the threshold for transferable work skills. *See Orn*, 495 F.3d at 639. A claimant, however, need not be utterly incapacitated to receive disability benefits, and sporadic completion of minimal activities is insufficient to support a negative credibility finding. *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001); *see also Reddick v. Chater*, 157 F.3d 715, 722–23 (9th Cir. 1998) (requiring the level of activity to be inconsistent with the claimant's claimed limitations to be relevant to his or her credibility).

There is no dispute that Ms. Petkus was able to a live a relatively normal life. *See, e.g.*, Tr. 29. The normalcy of Ms. Petkus' activities, however, does not extend to her ability to function at work or while she is working. During Ms. Petkus' last attempt at full-time work, she returned home from work and spent approximately three hours scratching the scabs on her body. Further, the stress of working prevented Ms. Petkus from completing basic chores and hygiene practices, such as washing her blood-stained clothes. *See, e.g.*, Tr. 544. Records from

Ms. Pamela McGill, a psychiatric nurse practitioner, show that Ms. Petkus suffers from a cyclical depression, resulting in intermittent periods of low activity. *See, e.g.*, Tr. 408 (noting Ms. Petkus' "did not shower, do her laundry, or eat a cooked meal"). Ms. Petkus testified that these depressive episodes occur every couple of months and can last for several weeks. Tr. 486, 550.

Ms. Petkus complains of functional limitations arising from hearing loss and mental impairments, which are not contradicted by the daily activities cited by the ALJ. Despite Ms. Petkus' ability to, for example, "walk for miles," the evidence demonstrates that she is unable to function in the workplace. *See, e.g.*, Tr. 190. As such, the ALJ's citation to Ms. Petkus' daily activities is not a clear and convincing reason to find her not credible.

The ALJ also found that Ms. Petkus' work activities after the alleged onset date were inconsistent with her alleged limitations. Tr. 32. The ALJ noted that after Ms. Petkus' alleged onset date, July 15, 1997, she performed work as a stocker in a retail store, library assistant, and veterinary assistant. *Id.*

Ms. Petkus' satisfactory performance of even part time work would support the ALJ's credibility finding; instead, the record reflects Ms. Petkus' inability to work at even a non-competitive position twice per month. Tr. 190. Ms. Petkus' last fulltime position was with the Social Security Administration, which she left because the communication demands and fast pace of the work caused a rapid decline in her ability to function and her mental state. Tr. 543-44 (noting she would scratch her skin for three hours each night and neglected household chores, like laundry, for six months). The symptoms described by Ms. Petkus during her final year with the Social Security Administration are consistent with the symptoms she reported while attempting to work after her alleged onset date.

A drug store employed Ms. Petkus as a cashier for three weeks before it terminated her for being unable to learn the necessary job skills and for not keeping up with the required pace. Tr. 482. After that, Ms. Petkus worked for a store stocking greeting cards for five to ten hours per week; again, the pace of the work exceeded her abilities and she was let go. Tr. 482-83. Finally, after two years of vocational rehabilitation, Ms. Petkus began working three days per week at a veterinary hospital. Tr. 483-84. After a few months, however, her impairments caused her to cut back the time she spent working for the hospital; eventually, she was only working one to two days per month. Tr. 484-85. Further, even while Ms. Petkus was working at the hospital, she was unable to complete many of the duties of the position. Tr. 485, 549-50. Indeed, Dr. Goza, her employer, emphasized that he hired her as a favor, without the expectation that she would be a fully capable employee. *See* Tr. 190.

A claimant's attempt and subsequent failure to maintain employment does not contradict the claimant's assertion of a disabling impairment. *See Lingenfelter*, 504 F.3d at 1038 ("It does not follow from the fact that a claimant tried to work for a short period of time and, because of his impairments, *failed*, that he did not then experience pain and limitations severe enough to preclude him from *maintaining* substantial gainful employment.") (emphasis in original). The evidence of Ms. Petkus' work attempts reveal that she tried time and again to find a position suitable for someone with her impairments, but despite her efforts, she was unable to maintain the requisite pace or she received substantial accommodations because of her impairments. Moreover, Ms. Petkus' latter attempts at work were undertaken after she received vocational rehabilitation and counseling. *See* Tr. 265-71, 483. As such, the ALJ erred by drawing an unreasonable inference from Ms. Petkus' unsuccessful work attempts.

**4.  Dr. Beickel's Opinion**

The ALJ also found that notes made by an examining psychologist supported finding Ms. Petkus not credible. Tr. 32. An ALJ may properly rely on "ordinary techniques of credibility evaluation" to support an adverse credibility finding. *See Smolen*, 80 F.3d at 1284.

The ALJ cited Dr. Beickel's opinion, which characterized Ms. Petkus as "quite manipulative" with a tendency to "act out," as evidence that Ms. Petkus "may not have been truthful about her ability to examining medical personnel."  Tr. 32. Although Dr. Beickel did make this comment, when the comment is read in the context of the whole opinion, it does not negatively reflect on Ms. Petkus' credibility. *See* Tr. 265-71. The reasonableness of the ALJ's interpretation of Dr. Beickel's comments is belied by Dr. Beikel's express finding that "the clinical and content scales probably reflect[] an underestimate of [Ms. Petkus'] psychological problems." Tr. 269. Indeed, Dr. Beickel found that Ms. Petkus "has [likely] presented herself in an overly positive light." *Id.* (internal quotation marks omitted); *see also* Tr. 268 ("*There was no evidence of malingering*, in fact, she presented in a very positive and over-optimistic way. At times she was Pollyanish in her responses and optimism.") (emphasis added). As such, the ALJ's reasoning is neither reasonable nor clear and convincing.

In sum, the ALJ's reasons for finding Ms. Petkus not credible are neither clear and convincing nor supported by substantial evidence; thus, the ALJ erred in finding Ms. Petkus not credible.

**B.  Medical Evidence**

Ms. Petkus also argues that the ALJ's rejection of the opinions of Drs. Feder, Bradley, and Tollerton was error. The Ninth Circuit distinguishes between the opinions of three types of physicians:  treating physicians, examining physicians, and non-examining physicians. The

opinions of treating physicians are generally accorded greater weight than the opinions of non-treating physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating doctor's opinion that is not contradicted by the opinion of another physician can be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). If a treating doctor's opinion is contradicted by the opinion of another physician, the ALJ must provide "specific, legitimate reasons" for discrediting the treating doctor's opinion. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). In addition, the ALJ generally must accord greater weight to the opinion of an examining physician over that of a non-examining physician. *Lester*, 81 F.3d at 830. As is the case with the opinion of a treating physician, the ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer v. Sullivan*, 908 F.2d 502 at 506 (9th Cir. 1990). If the opinion of an examining physician is contradicted by another physician's opinion, the ALJ must provide "specific, legitimate reasons" for discrediting the examining physician's opinion. *Lester,* 81 F.3d at 830.

        In July 1997, after Ms. Petkus left her position with the Social Security Administration, the Office of Personnel Management ("OPM") awarded her disability retirement benefits under the Federal Employees Retirement System ("FERS"). *See, e.g.*, Tr. 340-42, 546. In a short form decision, Dr. M. Bradley, working for the Disability and Special Entitlements Division, found Ms. Petkus disabled. Tr. 340-42. In Dr. Bradley's opinion, Ms. Petkus suffers from three impairments that render her disabled: profound hearing loss, depression, and a skin condition. Tr. 340. Dr. Bradley opined that Ms. Petkus' disabling conditions resulted in excessive absenteeism, which was incompatible with "either useful service or retention in [her] position." *Id.* Although the record does not contain all of the documentation supporting Dr. Bradley's decision, it includes an opinion offered by Dr. Feder, Ms. Petkus' treating psychiatrist.

In support of Ms. Petkus' application for federal employee disability, Dr. Feder offered an opinion letter. Tr. 345-47. Dr. Feder noted that Ms. Petkus suffers from a cyclical mental impairment that occasionally manifests with "brief episodes of more positive optimism and activity." Tr. 345. Dr. Feder opined that Ms. Petkus suffers from chronic recurring depression which, in combination with her dermatitis and hearing impairment, renders her disabled. *See* Tr. 345-47. More specifically, Dr. Feder concluded that Ms. Petkus is unable to sustain full-time employment because of an inability to manage stress secondary to her impairments. Tr. 347.

The ALJ considered the disability decision authored by Dr. Bradley but gave it "little weight." Tr. 33. The ALJ rejected Dr. Bradley's opinion because he failed to consider: (1) whether Ms. Petkus' hearing loss could be remedied with new hearing aids; (2) whether her mental impairments could be treated with counseling and medication; and (3) her ability to work after the decision.[2] *Id.* The ALJ also considered Dr. Feder's opinion and gave it "little weight." Tr. 33. The ALJ found Dr. Feder's opinion unpersuasive for the same reasons he gave for rejecting Dr. Bradley's opinion. *Id.*

Regardless of the applicable level of deference, the ALJ's reasons for rejecting Dr. Bradley's opinion and Dr. Feder's opinion were not supported by substantial evidence. The ALJ rejected the opinions of Drs. Bradley and Feder because they did not consider whether Ms. Petkus' functioning could be improved with newer hearing aids. Tr. 33. The ALJ relied on the May 2002 opinion of Mr. Craig Ford, an audiologist, who noted that Ms. Petkus' hearing aids were approximately eight years beyond their normal lifespan. Tr. 209. Shortly thereafter,

---

[2] The ALJ also noted that Dr. Bradley's decision is "a check-box assessment, which contains very little analysis of [Ms. Petkus'] conditions." Tr. 33. Although this is true, Dr. Bradley's decision is supported by Dr. Feder's opinion and is consistent with other evidence in record. *See Smolen*, 80 F.3d at 1288 (reversing the ALJ's rejection of a form opinion because the doctor's comments "appear to be based on . . . knowledge of [the claimant's] medical history and his experience in his specialty").

Ms. Petkus received new hearing aids. *See* Tr. 237. In August 2005, Dr. Alfred Schroder tested

Ms. Petkus' hearing with and without her new hearing aids. *Id.* Dr. Schroder opined that

Ms. Petkus has "severe to profound neurosensory hearing loss." *Id.* Notably, Ms. Petkus' aided

ability to discriminate speech was similar, if slightly worse, than it was with her previous hearing

aids. *Compare* Tr. 209 (recording speech discrimination scores of 64% for the left ear and 76%

for the right ear with the old hearing aids); *with* Tr. 238 (recording speech discrimination scores

of 60% for the left ear and 76% for the right ear with the new hearing aids). Because Ms. Petkus

did not show any significant improvement with her new hearing aids, the ALJ erred in rejecting

the opinions of Drs. Bradley and Feder for not considering the effect of potential but ultimately

unrealized gains.

   Contrary to the ALJ's next assertion, Drs. Bradley and Feder did not fail to account for

Ms. Petkus' capacity to improve with "psychological counseling and mental health treatment."

Tr. 33. Indeed, Dr. Feder treated Ms. Petkus' mental impairments for the year preceding her

opinion. Tr. 345 ("The patient was treated with an anti-depressant along with supportive

psychotherapy."). Further, Ms. Petkus' last year with the Social Security Administration, during

which time her symptoms were at their peak, was the same year that Ms. Petkus received mental

health treatment from Dr. Feder. Based on her experience, Dr. Feder aptly noted that treating Ms.

Petkus' depression would be "very difficult." *Id.* Ms. Petkus' treatment and concurrent decrease

in functioning contradicts the ALJ's reasoning. As such, the ALJ erred in concluding that

Drs. Bradley and Feder failed to consider whether Ms. Petkus' symptoms could be improved

with treatment.

   Finally, the ALJ rejected the opinions of Drs. Bradley and Feder because Ms. Petkus'

work activity after their respective assessments belied the doctors' conclusions. Tr. 33. As

discussed extensively above, Ms. Petkus' limited work activity after her alleged onset date does not contradict, but in fact supports, her claimed disability. *See supra* [12-13.] During each of Ms. Petkus' work attempts after her onset date, she demonstrated the same symptoms that led to her resignation from the Social Security Administration. *Compare* Tr. 482-83, 485, 545-50, *with* Tr. 543-44. Moreover, the cyclical nature of Ms. Petkus' depression, as identified by Dr. Feder, is consistent with Ms. Petkus' initial optimism, inspiring her to begin a new position and subsequent dejection, leading to her resignation. *Compare* Tr. 345 (noting Ms. Petkus' brief episodes of optimism and activity), *with* Tr. 408 (noting during a depressed period, Ms. Petkus did not shower, do laundry, or cook).

In sum, the ALJ erred in rejecting the opinions of Drs. Bradley and Feder because his findings were not supported by substantial evidence.

## C. Lay Witness Testimony

Ms. Petkus also argues that the ALJ erred in rejecting the lay witness testimony. An ALJ has a duty to consider lay witness testimony. 20 C.F.R. § 404.1513(d); *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012). An ALJ must provide "germane reasons" when rejecting lay testimony. *Molina*, 674 F.3d at 1114. An ALJ, however, is not required to address each witness "on an individualized witness-by-witness basis" and may reject lay testimony predicated upon reports of a claimant properly found not credible. *Id.*

In 2005, Dr. Larry Goza hired Ms. Petkus to work for his veterinary practice, over the objection of the other veterinarians in his office. Tr. 190. During the two year period between Ms. Petkus' hiring and Dr. Goza's statement, Ms. Petkus went from working two days per week to working approximate two days per month. *Id.* Dr. Goza, who employs twenty people in various capacities, noted that Ms. Petkus suffered from stress, which severely limited the work

activities she was capable of performing. *Id.* Eventually, Ms. Petkus performed only light cleaning duties because of her limited ability to hear and her inability to learn new tasks. *Id.*

The ALJ considered Dr. Goza's statements and found that they "indicate [Ms. Petkus] was able to work after the alleged onset date with her conditions." Tr. 33. The ALJ noted Ms. Petkus voluntarily left the position; Dr. Goza did not terminate her employment. *Id.*

As noted above, Ms. Petkus' work attempts after her alleged onset date do not detract from her allegations of disability; indeed, Ms. Petkus' fragmented attempts to work support the depression cycles noted by several of her physicians. *See, e.g.*, Tr. 269, 345. Similarly, Dr. Goza's statement recounts Ms. Petkus' attempts to work, but it does not characterize those attempts as successful. As Dr. Goza noted, he hired Ms. Petkus as a favor to her without the expectation of financial benefit. *See* Tr. 190 ("The other veterenarians in my office were opposed to my hiring of [Ms. Petkus], because of her lack of productivity. I justified the hiring because we do very well financially, and I thought that the job would be good for [her.]"). Thus, it is not surprising that Dr. Goza did not terminate her because his expectations for her employment were not those of a disinterested employer seeking a competitive employee. Although the ALJ did not explicitly reject Dr. Goza's testimony, the ALJ's interpretation of the testimony is neither reasonable nor supported by substantial evidence. Indeed, Dr. Goza's testimony indicates that in no way was Ms. Petkus able to successfully work.

## D.  Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000), *cert. denied*, 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by

further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r*, 635 F.3d 1135, 1138-39 (9th Cir. 2011) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir 2004)). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id* at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id.* The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F.3d 871 876 (9th Cir. 2003) (citing *Bunnell*, 947 F.2d at 348 (*en banc*)). The reviewing court should decline to credit testimony when "outstanding issues" remain. *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010).

As discussed above, the ALJ erred in finding Ms. Petkus not credible, in rejecting the opinions of Drs. Feder and Bradley, and in rejecting the lay witness statement given by Dr. Goza. The Commissioner argues that these errors are harmless. Def.'s Resp. at 11-12. Generally, "an ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination." *Molina*, 674 F.3d at 1115 (internal quotations and citations omitted). Thus, a court must "look at the record as a whole to determine whether the error alters the outcome of the case." *Id.*

These errors suggest a fundamental misunderstanding of Ms. Petkus' disabling conditions. Most notably, the ALJ repeatedly referred to Ms. Petkus' attempts to work after her

Case 3:12-cv-00075-SI    Document 19    Filed 05/16/13    Page 21 of 22

alleged onset date. But merely recognizing her attempts to work is insufficient; instead, the evidence documenting her work attempts reveals that despite her efforts, she cannot maintain fulltime, or even part time, employment. Further, the error cannot be harmless because the RFC and resulting hypothetical given to the VE do not contain all of Ms. Petkus' limitations supported by substantial evidence. *See Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001). As such, this case must be remanded.

Although this is the first time Ms. Petkus' case has reached a district court, her case had previously been remanded by the Appeals Council twice, resulting in three different decisions from three different ALJs. A further remand "would serve no useful purpose," *Lester*, 81 F.2d at 834, because it is now almost nine years after Ms. Petkus' date last insured and there are no identifiable evidentiary deficiencies in the record. In other words, further proceedings would likely add nothing to the record.

Finally, it is clear from the record that the ALJ would be required to find Ms. Petkus disabled if the erroneously excluded evidence was credited as true. Ms. Petkus' testimony reveals that her work attempts are ultimate futile; her depression, in concert with her hearing impairment and dermatitis, cause her to quickly become overwhelmed at work, which leads to a shutdown in her non-work life functions and burn out. Moreover, Ms. Petkus' testimony is corroborated by Dr. Goza, her former employer, who observed her inability to learn new tasks and gradual inability to maintain even a limited work schedule. Tr. 190. Finally, the opinions of Drs. Feder and Bradley support Ms. Petkus' limited ability to work and inability to work fulltime. *See, e.g.*, 340-42, 345-47. This is consistent with the VE's testimony that a person missing three days per month of work could not maintain competitive employment. Tr. 561. Accordingly, the Court concludes that the proper remedy is to remand this case for the payment

of benefits. *See Swenson v. Sullivan*, 876 F.2d 683, 689 (9th Cir. 1989) (remanding for the payment of benefits after "accepting as true Swenson's testimony of disabling fatigue"). As such, the Court does not reach Ms. Petkus' remaining assignments of error.

## CONCLUSION

The Commissioner's decision that Ms. Krueger is not disabled is REVERSED and this case is REMANDED for the payment of benefits.

DATED this 16th day of May, 2013.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge